IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

WILLIAM O. ROMINE                                               PLAINTIFF

V.                                        NO. 12-3059

MICHAEL J. ASTRUE,[1]
Commissioner of the Social Security Administration              DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a

decision of the Commissioner of the Social Security Administration (Commissioner) denying

his claims for a period of disability and disability insurance benefits (DIB) and supplemental

security income (SSI) benefits under the provisions of Titles II and XVI of the Social Security

Act (Act). In this judicial review, the Court must determine whether there is substantial evidence

in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

Plaintiff protectively filed his applications for DIB and SSI on November 12, 2008,

alleging disability since September 25, 2008,[2] due to "Copd." (Tr. 152, 163). An administrative

hearing was held on April 23, 2010, at which Plaintiff appeared with counsel and testified. (Tr.

27-80).

By written decision dated November 30, 2010, the ALJ found that during the relevant

time period, Plaintiff had an impairment or combination of impairments that were severe -

---

[1]Carolyn Colvin became the Acting Social Security Commissioner on February 14, 2013. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn Colvin has been substituted for Commissioner Michael J. Astrue as the defendant in this suit.

[2]At the hearing held before the ALJ, Plaintiff amended his onset date to September 25, 2008. (Tr. 77).

-1-

chronic obstructive pulmonary disease (COPD), hypertension, obesity, depressive disorder NOS, anxiety disorder NOS, panic disorder without agoraphobia, and cognitive disorder. (Tr. 14). However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 14). The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he can never climb, can only occasionally balance and stoop, and can never kneel, crouch or crawl. The claimant must avoid concentrated exposure to fumes, odors, dust, gasses and poor ventilation. The claimant is further limited to work where interpersonal contact is incidental to the work performed, the complexity of tasks is learned and performed by rote, with few variables and little judgment, and the supervision required is simple, direct and concrete.

(Tr. 16). With the help of a vocational expert (VE), the ALJ determined Plaintiff was not capable of performing his past relevant work, but that there were other jobs Plaintiff would be able to perform, such as production work - nut and bolt assembler, and bench assembler. (Tr. 19-20). Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied the request on April 6, 2012. (Tr. 1-4). Subsequently, Plaintiff filed this action. (Doc. 1). Both parties have filed briefs and this case is before the undersigned for report and recommendation. (Docs. 6, 7).

## I.     Evidence Presented:

Plaintiff was born in 1967 and received a GED. (Tr. 152, 168). Plaintiff worked for a termite and pest control company from 1992 until 2001, and then started his own pest control business, which he sold in 2008. (Tr. 34, 39). On September 26, 2008, Plaintiff presented

himself to the Phelps County Regional Medical Center because of increased shortness of breath, a cough, and chest pain. (Tr. 274).  At that time, he reported that he quit smoking two weeks prior thereto. (Tr. 276).  A chest x-ray demonstrated "tree-in-bud opacities" seen in the right and left upper lobes, which was reported as possibly due to bronchopneumonia, fungal or mycobacterial infection, and there was right basilar[3] atelectasis.[4] (Tr. 283). There were scattered non pathologically enlarged mediastinal[5] lymph nodes, and no axillary of hilar[6] lymphadenopathy,[7] of unclear etiology. (Tr. 283). The limited images of the upper abdomen demonstrated fatty infiltration of the liver. (Tr. 283).  Plaintiff was tested on a graded treadmill stress myoview treadmill, which revealed no electrocardiographic evidence of stress-induced ischemia[8] and there was fair exercise tolerance, but he was unable to achieve his target heart rate response secondary to progressive respiratory problems. (Tr. 285).  Plaintiff was discharged from the hospital on September 30, 2008, and it was reported that Plaintiff had pneumonia, early "LML" suspected, and clinical COPD with "RAD" component or inherent asthma; suspected uncontrolled GERD(gastroesophageal reflux disease); HTN (hypertension), for the most part controlled; Chronic Tobacco use disorder - encouraged cessation; HLD uncontrolled; and mild

---

[3]Basular - Relating to the base of a pyramidal or broad structure.  Stedman's Medical Dictionary 207 (28th ed. 20060

[4]Atelectasis - Decrease or loss of air in all or part of the lung, with resulting loss of lung volume itself.  Id. at 173.

[5]Mediatstinal - Relating to the mediastinum.
Mediastimun - A septum between two parts of an organ or a cavity. Id. at 1167-1168.

[6]Hilar - Pertaining to a hilum.
Hilum - The part of an organ where the nerves and vessels enter and leave.  Id. at 889.

[7]Lumphadenopathy - Any disease process affecting a lymph node or lymph nodes.  Id. at 1126.

[8]Ischemia - Local loss of blood supply due to mechanical obstruction (mainly arterial narrowing or disruption) of the blood vessel. Id. at 934.

AO72A
(Rev. 8/82)

hypokalemia.[9] (Tr. 279).

On October 7, 2008, Plaintiff presented himself to Baxter Regional Medical Center. (Tr. 238). It was noted that he had been discharged from a hospital the week before, on several medications, which he stated he did not have the money to fill.  (Tr. 238). Plaintiff had become increasingly short of breath since leaving the prior hospital. (Tr. 238).  It was reported that Plaintiff quit smoking in September, but had been smoking a pack of cigarettes a day for several years. (Tr. 238). The impression was:

> 1. Chronic obstructive pulmonary disease with exacerbation
> 2. Noncompliance. It is interesting to me that the patient cannot afford his medications but he is watching a DVD on his lap top computer in the hospital room when I examine him
> 3. Shortness of breath
> 4. Questionable pneumonia
> 5. Elevated liver function tests with history of treatment with Lipitor
> 6. Chronic hypertension

(Tr. 239).  It was noted that Plaintiff had continued to smoke, was feeling a little bit better wearing oxygen on the morning of the evaluation, and it was felt that Plaintiff's symptoms were most consistent with COPD exacerbation. (Tr. 248).  The attending physician reported that he believed the precipitating factor warranting Plaintiff's admission was his noncompliance with medications, and that the hospital had arranged for outpatient medications, so that he would not have any trouble obtaining those. (Tr. 249).

On November 5, 2008, a visit to St. Johns Mercy Med/St. Roberts revealed that Plaintiff

---

[9]Hypokalemia - The presence of an abnormally low concentration of potassium ions in the circulating blood; occurs in familial periodic paralysis and in potassium depletion due to excessive loss from the gastrointestinal tract or kidneys. The changes of hypokalemia may include vacuolation of renal tubular epithelial cytoplasm with impairment of urinary concentrating power and acidification, flattening of the T wave of the electrocardiogram, and muscle weakness. Id. at 934.

-4-

had quit smoking, and was assessed as follows:

> COPD reasonably well controlled
> COPD exacerbation
> HTN - poorly controlled
> Hyperlipidemia - Lipitor on hold due to LFT elevation
> while in hospital

(Tr. 301).

A spirometry test performed on November 11, 2008, indicated there was minimal obstructive lung defect. (Tr. 269).

On November 12, 2008, a visit to St. Johns Mercy Med/St. Roberts indicated Plaintiff's blood pressure was "much better now that he is back on meds," and the assessment was as follows:

> COPD reasonably well controlled
> HTN - better controlled
> Hyperlipidemia - Lipitor on hold due to LFT elevation
> while in hospital

(Tr. 304). A follow up visit to St. Johns on November 25, 2008, revealed that Plaintiff was taking his medication as instructed, there was increased nonproductive cough, and he was assessed with COPD, borderline controlled. (Tr. 308).

On February 27, 2009, Plaintiff presented himself to Dr. Lonnie Robinson for a check up on his depression, generalized anxiety, hypertension, dyslipidemia, obesity, and COPD. (Tr. 332). His blood pressure and depression had improved, but were not totally resolved. (Tr. 332). The impression was:

> 1. Depression
> 2. Generalized anxiety
> 3. Hypertension
> 4. Dyslipidemia

AO72A
(Rev. 8/82)

        5. Obesity
        6. COPD
        7. Erectile dysfunction

(Tr. 332).

On March 10, 2009, and April 8, 2009, Plaintiff went to Ozarks Medical Center, where he was assessed with COPD, HTN, and depression. (Tr. 327).

On April 16, 2009, Dr. John Scribner, of Salem 1st Care, wrote a letter "To Whom It May Concern" stating that he had been providing medical care for Plaintiff since March 10, 2009, and that he suffered from a pulmonary disease which caused severe shortness of breath, and that due to this condition, Plaintiff had difficulty with exertion, and became easily fatigued. (Tr. 330).

On May 5, 2009, Plaintiff visited with Dr. Robinson to discuss disability. (Tr. 333). Dr. Robinson advised Plaintiff that he did not do functional capacity evaluations. (Tr. 333). He further noted that personally, he thought Plaintiff's shortness of breath and decreased stamina could be "adequately treated by weight loss, which I do not think he has pursued adequately." (Tr. 333).

On May 14, 2009, non-examining consultant Dr. Jim Takach completed a Physical RFC Assessment. (Tr. 338-345). Dr. Takach opined that Plaintiff retained the ability to perform light work, with certain limitations. (Tr. 339-342).

On July 21, 2009, a Mental Diagnostic Evaluation was conducted by Robert L. Hudson, Ph.D., of Hudson Psychological Service. (Tr. 346-348). Dr. Hudson noted that Plaintiff smoked about one pack of cigarettes per week, was 5'10" tall and weighed 260 pounds. (Tr. 347). He further opined that depression seemed secondary to Plaintiff's medical situation and sequelae, and diagnosed Plaintiff as follows:

-6-

|          |                        |
|----------|------------------------|
| Axis I:   | Depressive Disorder NOS |
|           | Anxiety Disorder NOS    |
|           | Cognitive Disorder NOS  |
| Axis II:  | Defer                  |
| Axis III: | Defer to physical      |
| Axis V:   | GAF: 55-65             |

(Tr. 348). Dr. Hudson concluded that Plaintiff would be able to manage only in a limited way as he became winded very easily; that Plaintiff was doing nothing social other than having a woman for whom he cared; had no significant limitations in communication ability; had no significant mental/cognitive limits on basic work-like tasks, i.e. his basic problem was that he could not physically do the work; that he had limits on the ability to attend and sustain concentration on basic tasks; and had no significant limits on persistence in completing tasks or completion of tasks in a timely fashion, except to note his slowness to respond. (Tr. 348).

On July 23, 2009, a Mental RFC Assessment was completed by Kay Cogbill. (Tr. 351-353). She found Plaintiff to be moderately limited in seven categories and not significantly limited in twelve categories. (Tr. 353). Dr. Cogbill concluded that Plaintiff was able to perform work where interpersonal contact was incidental to work performed, e.g. assembly work, where complexity of tasks was learned and performed by rote, few variables, little judgment, and where supervision required was simple, direct and concrete. (Unskilled). (Tr. 353).

Dr. Cogbill also completed a Psychiatric Review Technique form on July 23, 2009, and concluded that Plaintiff had: a moderate degree of limitation in difficulties in maintaining social functioning and in maintaining concentration, persistence or pace; a mild degree of limitation in restriction of activities of daily living; and no episodes of decompensation, each of extended duration. (Tr. 365).

-7-

On August 27, 2009 and October 3, 2009, Plaintiff presented himself to Salem 1st Care, complaining of pain with exertion under his left breast around to mid back. (Tr. 404, 406).

On December 3, 2009, Plaintiff presented himself to Mountain Home Christian Clinic, stating that he was trying to quit smoking and needed help tapering off. (Tr. 419). The impression given was:

> HTN
> Dyslipidemia
> Elevated LFT's
> Cough

(Tr. 419). A chest x-ray dated December 15, 2009, revealed no acute process in the chest. (Tr. 420). On December 18, 2009, Plaintiff again went to Mountain Home Christian Clinic and the impression was COPD. (Tr. 417).

On January 24, 2010, Plaintiff presented himself to Baxter Regional Medical Center, complaining of right chest pain. (Tr. 390). A chest x-ray at that time revealed some mild atelectasis and no definite infiltrates were noted. A chest x-ray and right rib series revealed no grossly displaced rib fracture and the chest x-ray was clear with no hemothorax or pneumothorax.[10] (Tr. 392). The assessment was:

> 1. Chest pain/chest wall pain
> 2. Bronchitis.

(Tr. 391). On February 4, 2010, Plaintiff presented himself to Ozarks Medical Center, complaining of chest pains under his left breast. It was noted that he smoked 5 cigarettes per day. (Tr. 398).

On March 10, 2010, an Adult Diagnostic Assessment was completed, and the diagnosis

---

[10]Pneumothorax - The presence of free air or gas in the pleural cavity. Id. at 1526.

AO72A
(Rev. 8/82)

was:

| Axis I: | Generalized Anxiety D/O |
| | Panic d/o w/o agoraphobia |
| | Depressive d/o nos |
| Axis II: | no dx |
| Axis III: | COPD; HBP |
| Axis IV: | Economic problems; occupational problems; problems with health |
| Axis V: | Current GAF - 45 |

(Tr. 427).

On June 23, 2010, a Spirometry Report indicated that Plaintiff's lung age was 84 years, and the interpretation of the test was "Severe airway obstruction, with low vital capacity. Post bronchodilator test markedly improved." (Tr. 430).

On June 23, 2010, a General Physical Examination was performed by Dr. Shannon Brownfield. (Tr. 435-440). Dr. Brownfield diagnosed Plaintiff as follows:

1. COPD
2. HTN
3. CP - POSSIBLE RADICULAR PAIN
"Mod limit exertion"

(Tr. 439). In addition, Dr. Brownfield noted that she believed Plaintiff was feigning the extent of his symptoms. (Tr. 440).

## II.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards v. Barnhart, 314 F.

AO72A
(Rev. 8/82)

3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity.  Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §§423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§423(d)(3), 1382(3)(D).  A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing his claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able to perform other work in the national

-10-

economy given his age, education, and experience.  See 20 C.F.R. §416.920.  Only if the final

stage is reached does the fact finder consider the Plaintiff's age, education, and work experience

in light of his residual functional capacity (RFC).  See McCoy v. Schneider, 683 F.2d 1138,

1141-42 (8th Cir. 1982);  20 C.F.R. §416.920.

## III.   Discussion:

In his brief, Plaintiff argues that substantial evidence does not provide a basis for relying

on the existence of jobs found by the ALJ. (Doc. 6 at p. 2). In essence, Plaintiff takes issue with

the ALJ's reliance on the VE's testimony in response to the hypothetical question the ALJ posed

to the VE.  Plaintiff contends that he is unable to perform the jobs the VE identified.

The ALJ proposed the following hypothetical to the VE:

> Q: [INAUDIBLE] hypothetical individual, same age, education
> and past work, as the claimant, who's limited to sedentary work
> as defined by the Social Security regulations. Assume he can
> never climb; occasional balance, stoop; never kneel, crouch,
> crawl; assume the individual must avoid all exposure to fumes,
> odors, dust, gases – no, strike that – must avoid concentrated
> exposure to fumes, odors, dust, gases, poor ventilation; assume
> from a mental standpoint the individual is able to perform work
> where interpersonal contact is incidental to the work performed,
> complexity of tasks is learned and performed by rote with few
> variables [INAUDIBLE] judgment; supervision required is
> simple, direct, and concrete. Are there sedentary-level jobs that
> accommodate all those limits?

(Tr. 72-73).

In response to the ALJ's hypothetical question, the VE stated that the only thing available

would be some type of production work, and stated that one example would be a production

worker, or nut and bolt assembler. (Tr. 73). The VE noted that the DOT listed this job as light,

unskilled, and level 2. However, he testified that the U.S. Publishing Employment Survey

-11-

indicated that under the industry designation of production worker helper, there were approximately 13,200 jobs in the U.S. and about 450 in Arkansas at a sedentary, unskilled 2 level, with nut and bolt assembler being a sample. (Tr. 73). The VE also testified that as to the bench assembler, which is listed in the DOT as light, unskilled, and level 2, the U.S. Publishing Employment Survey indicated there were approximately 11,000 production workers in the U.S. and approximately 200 in Arkansas that do work at a sedentary, unskilled 2 level. (Tr. 73). Finally, the VE testified that a hand packer is listed in the DOT as medium, unskilled and level. However, U.S. Publishing Employment Survey indicated there were about 32,000 jobs in the U.S. and about 325 in Arkansas under the production worker category that do work at a sedentary, unskilled 2 level. (Tr. 73-74).

Plaintiff takes issue with the VE's use of the U.S. Publishing Employment Survey, arguing that this is not a publication of the government or one which the Social Security Administration has given administrative notice of acceptance and credibility. (Doc. 6 at p. 7).

The Court notes that 20 C.F.R. § 404.1566(d) provides that the Commission will take administrative notice of reliable job information available from various governmental and other publications, and gives examples of such publications in subsection (1)-(5). The Court also notes that the publication utilized by the VE in this case, the U.S. Publishing Employment Survey, is not included in this list. However, as pointed out by Defendant, in 20 C.F.R. § 404.1566(e), the use of the services of a VE or other specialist is authorized.

In this case, not only did the ALJ rely on testimony by the VE, but the VE also explained the conflict between the DOT and his jobs by utilizing a publication. The Eighth Circuit has held that the DOT definitions "are simply generic job descriptions that offer the approximate

-12-

maximum requirements for each position, rather than their range." <u>Wheeler v. Apfel</u>, 224 F.3d 891, 897 (8th Cir. 2000)(quoting <u>Hall v. Chater</u>, 109 F.3d 1255, 1259 (8th Cir. 1997). "'The DOT classifications may be rebutted with VE testimony which demonstrates specific jobs whether classified as light or sedentary, may be ones that a claimant can perform.'" <u>Jones v. Astrue</u>, 619 F.3d 963, 978 (8th Cir. 2010)(quoting <u>Dobbins v. Barnhart,</u> 182 Fed. Appx. 618, 619 (8th Cir. 2006)(unpublished per curiam).

Plaintiff also argues that two of the jobs suggested by the VE - bench assembler and hand packager - require a reasoning level of 2, which he claims exceeds his RFC for "work where the complexity of tasks is learned and performed by rote, with few variables and little judgment required."   In his RFC, the ALJ found that the Plaintiff was "further limited to work where interpersonal contact is incidental to the work performed, the complexity of tasks is learned and performed by rote, with few variables and little judgment, and the supervision required is simple, direct and concrete." (Tr. 16).

In <u>Moore v. Astrue</u>, 623 F.3d 599 (8th Cir. 2010), the hypothetical given by the ALJ to the VE stated that the individual has "a 12th grade education with assistance by resource classes" and that he is capable of "carrying out simple job instructions" and performing "simple, routine and repetitive work activity at the unskilled task level."   <u>Id.</u> at 604. The VE identified occupations of hand packager and laundry worker, which, according to the DOT, require "Level 2" reasoning, "defined as the ability to '[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions.'" <u>Id.</u> (quoting Dictionary of Occupational Titles (4th ed. 1991) at 1011).  The Eighth Circuit in <u>Moore</u> held that the Level 2 reasoning definition is "an upper limit across all jobs in the occupational category, not a requirement of every job within the

-13-

category." Id.  It further stated:

> "A" claimant's reliance on the *DOT* as a definitive authority on job requirements is misplaced because *DOT* definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range."

Id. (quoting Page v. Astrue, 484 F.3d 1040 , 1045 (8th Cir. 2007).

As was found in Moore, in the present case, there is nothing in the record to suggest that the VE ignored the reasoning limitations in the hypothetical in determining that the listed occupations encompassed suitable jobs, and the ALJ could properly assume that the VE framed his answers based on the factors the ALJ told him to take into account.  Id. at 604-605.

The Court is of the opinion that substantial evidence supports the ALJ's phrasing of the hypothetical to the VE, and there was no conflict between the VE's testimony and the DOT, and the ALJ properly relied on the testimony.

**IV.    Conclusion:**

Based upon the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of the  undersigned's report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 4th day of June, 2013.

*/s/ Erin L. Setser*
HONORABLE ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-14-